**Opinion issued March 28, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00660-CV

_____

### GREGORY  DEFRANCESCO, Appellant

### V.

### MEMORIAL VILLAGES POLICE DEPARTMENT, Appellee

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-43853**

---

## MEMORANDUM OPINION

After appellee Memorial Villages Police Department terminated appellant

Gregory DeFrancesco as an officer, DeFrancesco filed a lawsuit under the Texas

Commission on Human Rights Act, alleging that MVPD retaliated against him after

making complaints about a hostile work environment he claimed was caused by

other officers discriminating against him based on his Hispanic heritage and age. After some discovery, MVPD filed a plea to the jurisdiction and moved for summary judgment, arguing that the trial court lacked subject-matter jurisdiction over DeFrancesco's claims because he failed to state a viable retaliation claim under Texas Labor Code section 21.055 and it was therefore protected from suit by its sovereign immunity. The trial court granted the plea and motion. DeFrancesco appeals, arguing that the trial court's ruling was improper because he did state a viable retaliation claim and because he raised genuine issues of material fact that needed to be resolved by a factfinder. Because we conclude that the evidence conclusively negates DeFrancesco's claim that he engaged in a protected activity, we affirm.

### Background

After twenty-eight years in the Houston Police Department, appellant Gregory DeFrancesco retired and began working for appellee Memorial Villages Police Department. MVPD is an interlocal agency that covers the Cities of Bunker Hill, Piney Point, and Hunter's Creek. MVPD's governing body is a six-member Board of Commissions. All MVPD employees are at-will employees who "serve at the will and pleasure of the Commission." The Commission has the exclusive power of terminating police-officer employees.

***DeFrancesco's claimed Hispanic heritage***

DeFrancesco's lawsuit against MVPD, in large part, centers around his allegation that he claimed some of his fellow MVPD officers were harassing him because of his Hispanic heritage. Whether DeFrancesco does in fact have a Hispanic heritage is in dispute. Accordingly, we discuss some of the circumstances surrounding DeFrancesco's claimed Hispanic heritage.

DeFrancesco was born in Bronx, New York. He never knew his biological parents, Bill Ryan, who is Irish, and Barbara Stafford, whose heritage is unknown. He was adopted by Steve DeFrancesco, whose parents were born in Italy. DeFrancesco spoke only English until he became an adult and learned Spanish through formal coursework. He grew up in a primarily Italian neighborhood and "identifies [himself] as having Italian upbringing, Italian heritage, Italian culture." To DeFrancesco, the term "Hispanic" means "[s]omebody that has genetic or relatives that come from a Hispanic country." DeFrancesco claims that his adoptive grandfather—the father of the man who adopted him—came from Spain and that he is therefore Hispanic.

DeFrancesco's claim of Hispanic heritage is relatively new. During his first marriage, between 1985 and 1991, he could not recall whether he referred to himself as Hispanic. For the first several years of his employment with the Houston Police Department, he identified as "white." But shortly after the Houston Police

3

Department settled a lawsuit brought by and on behalf of African-American and Hispanic officers, DeFrancesco identified himself as "Hispanic" on an application for a promotion to sergeant.

Although DeFrancesco claims to be of Hispanic heritage, this has not stopped him from voicing racially derogatory criticisms of Hispanics. For example, on his Facebook page, DeFrancesco posted an image of what appears to be a group of Mexicans walking through the dessert. The picture is accompanied by a caption that reads, "What is Mexico's national sport? Cross country." He also posted a statement against a Mexican-flag backdrop that reads, "Illegal migrants sent $56 billion in pure cash back to their home countries last year and every year. That's after their kids enjoyed free education, free lunches and free medical care paid for by you." Another of DeFrancesco's posts reads,

> Isn't the English language interesting?
>
> A. Did you know that the word "race car" spelled backward still spells "race car"?
>
> B. Did you know that "eat" is the only word that if you take the 1st letter and move it to the last, it spells its past tense "ate"?
>
> C. And have you noticed that if you rearrange the letters in "illegal immigrants" and add just a few more letters, it spells out: "Go home you f***ing free-loading, benefit-grabbing, kid-producing, violent, non-English speaking a**holes and take those other f***ing hairy-faced, sandal-wearing, bomb-making, goat-f***ing b***ards with you"?
>
> How weird is that???

4

The record contains many more profane and racially charged posts. DeFrancesco's posts are not limited to disparaging remarks about Hispanics but extend to African-Americans, Middle Easterners, and women. His online posts do, however, without exception, praise Italians. In many of the posts about Italians, DeFrancesco makes no attempt to hide the fact that he adores, and claims membership in, the Italian culture. In one such post is a picture of infamous mobster, John Gotti, sitting in a confident pose with a caption that reads, "Don't ever say anything you don't want played back to you someday." The irony is not lost.

### *The first Denny's conversation*

On September 16, 2012, about two months after he was hired by MVPD, DeFrancesco was socializing with HPD officers at a Denny's restaurant outside of MVPD's jurisdiction. During the conversation, DeFrancesco criticized some of the MVPD officers. He focused his attention primarily on Officer Rebecca Sosa, the officer who was tasked with supervising DeFrancesco during his job orientation and initial field training. He explained that Sosa "treated him like a bitch" and that he does not know how her husband could withstand a relationship with her. These statements were reported in a complaint to then Chief Haril Walpole, who had hired DeFrancesco, although the record is not clear as to how or by whom the complaint was made.

5

Chief Walpole, following internal policies, provided DeFrancesco with a copy of the complaint and asked for a response. In his September 27, 2012 response, DeFrancesco attempted to explain that he was simply talking with friends about the circumstances of his retirement from the HPD and how he was enjoying the new job. He explained he made those comments about Sosa because she "treated [him] like a bitch" during his initial training. DeFrancesco noted that other officers were giving him a hard time, specifically referencing a time when his shift supervisor, Sergeant Mike Sprinkle, used a racial slur in reference to his Hispanic heritage. Chief Walpole took the complaint against DeFrancesco and his response under advisement.

***The second Denny's conversation ("The Denny's tape")***

About two weeks after providing Chief Walpole his response, but before Chief Walpole issued his decision, DeFrancesco again met up with his HPD friends at the same Denny's restaurant. This time, DeFrancesco left his microphone on, and the entire conversation was recorded.[1] During this second Denny's meet-up, DeFrancesco stated that he suspected he would be reprimanded for his comments about Sosa. Yet, he referred to her as a "bitch" or that "blonde bitch." He then bragged to the other officers that his job was a "piece of cake," stating, [A]ll I do is

---

[1] The record does not reveal whether DeFrancesco left his microphone on intentionally or accidentally.

sit . . . in the middle of the road, my radar running, [and play on my] iPad. . . . They can never say you're not working." He then began talking about Sergeant Sprinkle.

DeFrancesco explained that Sergeant Sprinkle was hypercritical of his reporting and other aspects of his performance. DeFrancesco described him as a "miserable f**k" who sits around "all day long [and] kick[s] back reports for grammatical errors." DeFrancesco believed Sergeant Sprinkle disliked him out of professional jealousy: "I think he was intimidated because I was a sergeant with HPD . . . and he thought he was the big man on campus." Expressing his contempt for Sprinkle, DeFrancesco then stated, "[I]f I wasn't a cop, I'd beat the f**k out of him. I mean he's the kind of guy you could just pound and pound and pound."

Before the conversation was over, DeFrancesco also described how two other officers, Paul Hindman and Brian Norwood, harassed him. According to DeFrancesco, Hindman followed him, spied on him, and once swerved a vehicle at him. Norwood, who DeFrancesco described as a "prick," allegedly followed DeFrancesco, taking photos of him eating at Denny's and making a threatening comment: "The only thing I have for DeFrancesco is a Remington slug." Norwood's harassment stopped following his termination for the "Remington slug" comment.

### DeFrancesco's written reprimand

On October 18, 2012, after reviewing the complaint stemming from the first Denny's conversation and DeFrancesco's response, Chief Walpole issued a written

reprimand. In the reprimand, Chief Walpole acknowledged the casual nature of the conversation and viewed that as a mitigating circumstance. He issued the reprimand, however, because, by disparaging his job and other MVPD officers, DeFrancesco violated an MVPD policy that prohibited its officers from "publicly criticiz[ing] or ridicule[ing] members of [MVPD] . . . when such talking or other expression is defamatory, obscene, unlawful, or tends to impair the overall efficient and effective operation of [MVPD]." Chief Walpole then required DeFrancesco to refrain from any conversation outside MVPD that could reflect negatively on the department or its employees; bring any complaints about the department or its employees to his supervisor; and apologize to Sosa. Shortly after Chief Walpole issued DeFrancesco's reprimand, MVPD discovered the recording of the second Denny's conversation. The contents of the recording spread through many MVPD officers who came to view DeFrancesco as a slacker who disrespects the department and its officers.

### *"The YouTube incident"*

In November 2012, Lakesha Kelly, an MVPD dispatcher, confided in DeFrancesco about an incident where two other officers had showed her a video on YouTube in which a woman called President Obama a "n****r" and expressed her hope that he is assassinated. According to Kelly, DeFrancesco encouraged her to report the two other officers' conduct, but she did not. DeFrancesco told his supervisor, Sergeant Lane Owen, about the incident. Owen then asked Kelly about

8

the incident, and Kelly told him that she did not want to pursue it and would not file a grievance.

### *DeFrancesco's first letter to MVPD*

On January 15, 2013, DeFrancesco sent his first letter, through his attorney, to MVPD. In that letter, DeFrancesco's attorney stated that DeFrancesco "seeks redress under the following: age discrimination, race discrimination and retaliation." The letter did not provide any factual details: "We have not provided facts to support this claim as a courtesy to you. They will be provided to you by the EEOC once we file the Charge of Discrimination. We do this as a courtesy to you, not to deprive you of the details." DeFrancesco later testified during his deposition that this was his first formal complaint of discrimination.

### *Interim Chief Osborne and Lieutenant Sorrell*

After Chief Walpole stepped down in February 2013, Roy Osborne acted as the interim chief until the Board of Commissioners picked a replacement. DeFrancesco later acknowledged that he knows of no evidence suggesting that Chief Osborne was prejudiced against him for being Hispanic, nor is he aware of any facts suggesting that Chief Osborne was angered by any complaint DeFrancesco had made about discrimination. In fact, DeFrancesco stated that, "[f]rom early February to May [2013], I was not bothered or harassed and did not hear any racial utterances." DeFrancesco explained that he later found out that during that four-month period,

Lieutenant Gerald Sorrell was at "FBI school" and that as soon as Lieutenant Sorrell returned in May, the harassment started back up.

According to DeFrancesco, his relationship with Lieutenant Sorrell turned sour shortly after he started working for MVPD. DeFrancesco explained that after he first arrived, a group of officers, including Lieutenant Sorrell, would walk into homes where they suspected underage drinking was occurring despite not having received "a call for service." When Lieutenant Sorrell asked why DeFrancesco would not participate with the group of officers, DeFrancesco replied, "The little group that's going to get civil rights violations? I'm not into that." After that incident, DeFrancesco noticed that any time he made a stop or wrote a ticket, Lieutenant Sorrell would call him into his office and berate him. DeFrancesco suspected that Lieutenant Sorrell's disdain stemmed from the "little group" incident, the fact that Walpole hired DeFrancesco, and the perception by some MVPD officers that Walpole was going to "make [DeFrancesco] assistant chief or something."

***Administrative leave and DeFrancesco's second letter to MVPD***

On May 26, 2013, Chief Osborne placed DeFrancesco on administrative leave with pay, pending an investigation into several matters, including his missing court appearances in February and May of 2013; sending a text message to a dispatcher that stated, "Keep Sosa in your prayers; she is going to need it before this is over"; revealing potentially exculpatory information to the defense attorney in a pending

criminal case but not to the prosecutor; and making public comments on a Facebook page that called fellow officers in the Department into disrepute.[2] About a month later, Chief Osborne provided DeFrancesco with a formal disciplinary notice that outlined these matters and requested a response.

Ten days after receiving the notice from Chief Osborne, DeFrancesco, through his attorney, delivered another letter to MVPD and the Commission complaining of discrimination and retaliation.

> Officer DeFrancesco has been put on administrative leave now for a month—the longest time the MVPD has put any officer on such leave. This appears to be in retaliation for Officer DeFrancesco's complaint about age discrimination and employment concerns and for allegedly speaking with criminal defense attorney, Neal Davis, about a pending legal matter where Officer DeFrancesco was a witness. Mr. Davis has provided a clear, unequivocal written statement regarding that matter. Efforts to prevent criminal defense attorneys from interviewing police officer witnesses in pending criminal cases may be against *Brady v. Marlyland* (373 U.S. 83 (1963)) and, furthermore, may be considered criminal witness tampering under the Texas Penal Code. . . . .
>
> Additionally, Officer DeFrancesco has had to endure racial and ethnic slurs by other MVPD officers which has created a hostile work environment for Officer DeFrancesco as pointed out in a more extensive previous letter to the MVPD dated January 15, 2013 from the Law Office of James R. Davis.

---

[2] In this Facebook post, DeFrancesco commented on the death of a former MVPD officer, stating, "To those pieces of reptilian feces that treated him wrong at a PD I cannot mention now, you should die with a broomstick up you're a**."

11

### *DeFrancesco's meetings with Chief Sanders*

When the Board of Commissioners selected J.D. Sanders to take over duties as MVPD's chief of police in July 2013, DeFrancesco was still on paid leave and the resolution of former interim Chief Osborne's complaint against DeFrancesco was still pending. Chief Sanders conducted his own investigation into Osborne's complaint. Chief Sanders reviewed DeFrancesco's work history, spoke with DeFrancesco's supervisors, and listened to the Denny's tape.

On July 3, 2013, Chief Sanders met with DeFrancesco. The purpose of the meeting was to address the pending complaint. DeFrancesco reiterated his complaints of a hostile work environment, specifically mentioning Sprinkle's use of racial slurs and the YouTube incident. When Chief Sanders asked DeFrancesco why he thought Sprinkle was picking on him, DeFrancesco stated, "I think he has an inferiority complex. I think the fact that I don't kiss his a**. I think that he knows I have ten times the experience, education, and training that he does." And when asked why the other officers were giving him hard time, DeFrancesco replied, "I know I probably have more experience and more education and training than probably any of . . . these guys put together, and I don't feel I have to prove that. So meanwhile, . . . because of that I'm just a target." DeFrancesco then stated that Lieutenant Sorrell "never wanted me on this department." Chief Sanders asked DeFrancesco why he believed that, and DeFrancesco replied, "I think [Lieutenant Sorrell] didn't, as much

as at the time he acted like he liked Walpole, I don't think he did and wanted Walpole, anything to do with Walpole not to, you know . . . because Walpole wanted me he didn't want me. And I think that's the crux of it." Later in his conversation with Chief Sanders, DeFrancesco explained, "[E]ven though I'm, you know, light skinned and everything like that I, my grandfather was from Spain. He was a Celtic, but he was from Spain. So, I claim I'm Hispanic."

On July 9, 2013, Chief Sanders met with DeFrancesco again. Chief Sanders foreshadowed the conclusions of his investigations, stating that the allegations in Chief Osborne's complaint "didn't rise to the level of something that would go to the level of termination." Chief Sanders did note, however, that there were things he found disturbing, such as the disparaging remarks on the Denny's tape. He then warned DeFrancesco, "[T]here's never going to be another word said outside this department from you to anybody, whatsoever at all, about disparaging or discontent here." Chief Sanders instructed DeFrancesco to apologize to Sosa personally. He also noted that there was a perception among the department that DeFrancesco was using sick time to take days off when he was not really sick. Accordingly, Chief Sanders instructed DeFrancesco to use sick time appropriately.

The next day, DeFrancesco was taken off administrative leave, and Chief Sanders issued an order restricting DeFrancesco to the "jurisdictional bounds of the Memorial Villages Police Department" and warning him that further policy

13

violations would "likely . . . result in your separation from employment." Chief Sanders provided Sergeant Lane Owens, DeFrancesco's new supervisor, a copy of the order. Sergeant Owens reiterated the order to DeFrancesco personally, telling DeFrancesco that he expected him to request permission before leaving the jurisdiction.

*Further investigation into DeFrancesco*

In August and September 2013, Sergeant Owens received several reports from other officers that DeFrancesco was not responding to calls or that his responses were unreasonably late. To verify these complaints, Sergeant Owens drove around to locate DeFrancesco on patrol and monitored his call responses over a few weeks. On several occasions, Sergeant Owens could not find DeFrancesco or had difficulty finding him. Sergeant Owens also noted that that there "were numerous occasions where he did not respond to a dispatched call or his responses times were much longer than the normal response times of other officers." For Sergeant Owens, DeFrancesco's late or no responses warranted further investigation. Accordingly, Sergeant Owens asked Lieutenant Sorrell to generate a report on DeFrancesco's whereabouts based on the department's GPS system on September 12 and 17, 2013—two of the dates DeFrancesco reportedly did not answer his radio. Before Lieutenant Sorrell returned with his findings, DeFrancesco met with Chief Sanders

again on September 27, 2013 to complain about a written evaluation he had received that was based on DeFrancesco's performance up until January 2013.

DeFrancesco's evaluation stated that he needed to improve his work ethic and pointed to the fact that he had used sick time in a way that suggested it was planned, such as using a sick day the day before or after a long break. Chief Sanders told DeFrancesco he would have to talk with the person who wrote the evaluation because he was not familiar with the facts. That being said, Chief Sanders explained to DeFrancesco that there was a perception among department officers that he used sick days as vacation days. Chief Sanders then noted another reason DeFrancesco's work ethic may have been questioned, stating, "One of the things that's been discussed with me in the last two to three weeks . . . is that there's a perception now that you're spending time during your shift, parked for two hours at a time." DeFrancesco explained that during those times he was on radar. Chief Sanders responded, "[M]y philosophy was direct—running radar at 2 o'clock in the morning is a waste of damned time. I'd much prefer to be patrolling and moving about and not parked in one place. . . . And we call it patrol, not park." During the conversation, Chief Sanders acknowledged that DeFrancesco could eat at Denny's again, even though it was out of MVPD's jurisdiction. He noted, however, that when other MVPD officers discover that DeFrancesco is at the particular Denny's, they are reminded of the earlier recorded conversation and assume the worst.

15

Sometime after DeFrancesco's meeting with Chief Sanders, in October 2013, Lieutenant Sorrell returned to Sergeant Owens with his findings, noting that on September 12 and 17, 2013, DeFrancesco had been sitting for periods in excess of twenty-five minutes. Lieutenant Sorrell also noted that GPS data for the September 27-to-28 shift—the day of and the day after Chief Sanders instructed DeFrancesco not to sit around running radar—showed DeFrancesco's vehicle outside of the jurisdiction for approximately thirty minutes. These findings sparked Sergeant Owens to ask Lieutenant Sorrell to conduct a further investigation on DeFrancesco's whereabouts during October 2013. Lieutenant Sorrell found that on October 24, 2013, DeFrancesco had left the jurisdiction for approximately thirty-six minutes to drive home. Another officer, Lieutenant Eric Jones, also reviewed the GPS data and confirmed Lieutenant Sorrell's findings. Lieutenant Jones discovered that DeFrancesco frequently drove a long circuit, what Lieutenant Jones viewed as an effort to add mileage to his vehicle and making it look like he was not just sitting around. Because of this conduct, including the fact that DeFrancesco had not sought permission to leave the jurisdiction during his shift, Sergeant Owens instituted a disciplinary action against DeFrancesco and prepared an Employee Performance Information report and notified Chief Sanders of his findings on October 25, 2013.

### *DeFrancesco's termination from MVPD*

Six days after receiving Sergeant Owen's report, Chief Sanders met with DeFrancesco again. Chief Sanders explained the report's allegation that DeFrancesco left the jurisdiction to return home without notifying his supervisor or otherwise receiving permission. DeFrancesco acknowledged that he left the jurisdiction to get his radio from his house but noted,

> [W]hen I met with you . . . about a month, month and a half ago . . . you told me, specifically, that was just, that boundary that those brackets you put on me for that leave the area and going to Denny's without permission was for a very short period of time after I came back to work. And that they were not in effect anymore.

DeFrancesco then explained that he had forgotten his radio at home three times in the past. He explained that the first time he asked Sergeant Owens for permission, and he said okay. The next time he asked Sergeant Owens for permission to get his radio, DeFrancesco noted that Sergeant Owens seemed "very flustered and put out by the fact that I would have to go and get my radio." The third time, DeFrancesco explained, "I did without a radio and I waited until the traffic died down." Chief Sanders agreed that he lifted the order but expressed his disappointment with DeFrancesco for having left his radio at home for now the fourth time. Chief Sanders also explained that he never authorized DeFrancesco to leave the jurisdiction without notifying his supervisor. DeFrancesco acknowledged that he did not notify Sergeant Owens that he was leaving the jurisdiction but stated that he did call two other

17

officers who said they would cover for him. Those two officers later denied ever telling DeFrancesco that they would cover for him. Chief Sanders also pointed out to DeFrancesco that there is an area near the Memorial Mall that the GPS data indicated was a spot DeFrancesco would "park . . . for an hour or hour and 15 minutes at a time." DeFrancesco said the GPS data is wrong because the last time he remembers going into the area was four months earlier when he stopped at the Chick-fil-a. DeFrancesco acknowledged that no one else drove his patrol vehicle when he was on duty.

Chief Sanders recalled their previous meetings and noted that he had previously told DeFrancesco that he was going to have work hard to mend his relationships with the other officers, and that the mending would have to take the form of changes in the way he interacts with the other officers and the way he conducts himself on the job. Chief Sanders acknowledged that DeFrancesco did part of that by apologizing to many of the officers he was not getting along with. But importantly, Chief Sanders explained, DeFrancesco did not change the way he was conducting himself on the job. He was still sitting around for prolonged periods of time just running radar and leaving the jurisdiction without notifying his supervisor. Then the following exchange occurred:

> Chief Sanders:     You can walk out of here with your head held high, or you can walk out of here with your tail tucked between your legs. Old southern phrase, but I think you understand the meaning.

DeFrancesco:     No, I really don't.

Chief Sanders:     Okay, well let me put it to you in plain English. I'll accept a resignation, if you're not I'm going to recommend a termination.

DeFrancesco:     I'm not resigning the department.

Chief Sanders:     Okay, then what we'll do. Do you have anything else you want to add?

DeFrancesco:     No, just that—

Chief Sanders:     The Commission meeting is on November the 11th at 6 o'clock here at this building, and I will be presenting this [complaint] to the Commission at the time, recommending a termination on you. I will, I give you the things that you need today in writing.

At the November 11, 2013 meeting, Chief Sanders presented a table of GPS data prepared by Lieutenant Jones that listed every time DeFrancesco's patrol unit was stationary for a prolonged period of time as evidence that DeFrancesco neglected his duty. Chief Sanders also informed the Commission about the time DeFrancesco left his patrol to retrieve his radio without notifying dispatch or requesting permission from his supervisor. DeFrancesco, appearing with his attorney, claimed that he was not notified of many of the charges against him and that Chief Sanders did not provide him with copies of their recorded conversations. DeFrancesco's attorney then spoke, arguing that DeFrancesco's record was exemplary and that the Commission should not vote to terminate him. At the

19

conclusion of the hearing, the Commission unanimously voted to terminate DeFrancesco.

***DeFrancesco's post-employment actions***

After the Commission hearing, Chief Sanders filed the required F-5 Separation of License form concerning DeFrancesco's termination with the Texas Commission on Law Enforcement. In the F-5 form, Chief Sanders indicated that DeFrancesco was dishonorably discharged for insubordination. DeFrancesco petitioned to change the F-5 report, arguing that the Commission terminated him for neglect of duty and not insubordination. The State Office of Administrative Hearings held a hearing on DeFrancesco's petition, and the administrative-law judge concluded that the F-5 report should not be changed.

On November 25, 2013, DeFrancesco applied for unemployment benefits, which he received. But after a series of appeals, he was denied unemployment benefits when the Texas Workforce Commission concluded that DeFrancesco "mismanaged his position of employment by failing to follow his employer's instructions by prohibiting him from leaving the jurisdiction while on duty without permission." Then, on April 9, 2014, DeFrancesco filed an EEOC charge. After completing the EEOC process, DeFrancesco filed this case.

DeFrancesco alleged that he was terminated in retaliation for complaining about the hostile work environment and racial discrimination he and Kelly faced at MVPD. During DeFrancesco's deposition, the following exchanges occurred:

Q:     Did Sprinkle ever use any ethnic slurs in referring to you?

A:     No.

Q.     [D]id any of the officers of [MVPD] at any time you were employed there refer to you using some derogatory term for Hispanics?

A:     Not to me, no.

Q:     Are you aware of any officer of [MVPD] using any racial or ethnic slur about you in conversations they reportedly had with other people?

A:     Not about me.

Eventually, MVPD filed a combined plea to the jurisdiction and motion for summary judgment, which the trial court granted. DeFrancesco appeals

**Analysis**

DeFrancesco raises three issues. He contends that the trial court improperly granted MVPD's plea to the jurisdiction because he pleaded a prima facie case of retaliation under Texas Labor Code (TCHRA) section 21.055; that the trial court improperly granted summary judgment because his summary-judgment evidence created material issues of fact; and that the trial court improperly granted the partial plea to the jurisdiction and partial summary judgment on his requested injunctive

relief. Because we conclude that the trial court's decision to grant MVPD's plea to the jurisdiction was proper, we only reach DeFrancesco's first issue.

## I. Standard of Review

DeFrancesco contends that the trial court erred by granting MVPD's plea to the jurisdiction. In its plea, MVPD argued that the trial court lacked subject-matter jurisdiction over this suit because DeFrancesco's retaliation claim was barred by sovereign immunity. Absent the State's consent to suit, sovereign immunity protects certain governmental units from suit and defeats a trial court's subject matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). Although the TCHRA waives immunity, the waiver applies only if the plaintiff "actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder." *Mission Consol. ISD v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). MVPD contended, and the trial court ruled, that DeFrancesco failed to allege a TCHRA violation. Because subject-matter jurisdiction is a question of law, we review DeFrancesco's challenge to the trial court's ruling de novo. *Miranda*, 133 S.W.3d at 226.

In analyzing a plea to the jurisdiction, courts should avoid "delving into the merits of the case" and instead focus on the pleaded facts and determine whether they affirmatively demonstrate the court's jurisdiction. *Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *Garcia*, 372 S.W.3d at 635. But when a plea to the jurisdiction

is submitted with evidence—like was done here—courts move beyond the pleadings and consider the evidence necessary to resolve the jurisdictional issue. *See Alamo Heights ISD v. Clark*, 544 S.W.3d 755, 770–71 (Tex. 2018).

In these cases, our review mirrors that of a traditional summary-judgment motion. *Id.* at 771. When the party asserting a plea to the jurisdiction conclusively negates a jurisdictional fact, the nonmovant may defeat the plea only by raising a genuine issue of material fact. *City of Houston v. Downstream Envtl.*, 444 S.W.3d 24, 39 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). In determining whether a fact issue exists, we take as true all evidence favoring the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Clark*, 544 S.W.3d at 770–71. Nevertheless, we cannot disregard the context of the evidence, nor can we ignore inferences that are unfavorable to the plaintiff that reasonable jurors could not. *Id.*

## II. Elements of a retaliation claim

To establish a prima facie case of retaliation under the TCHRA, an employee must show that he engaged in a "protected activity"; he suffered a material adverse employment action; and a casual link between the protected activity and the adverse employment action. *Id.* at 782; TEX. LAB. CODE § 21.055. In its plea to the jurisdiction, MVPD challenged whether DeFrancesco's alleged protected activities

23

were in fact protected and, if they were, whether he established the necessary causal link. We begin with DeFrancesco's claimed protected activities.

## A. DeFrancesco's alleged protected activities

DeFrancesco contends that he engaged in five separate protected activities: First, his meeting with Sergeant Owens in November 2012 and mentioning that two officers showed Officer Kelly an offensive YouTube video in which a woman referred to President Obama as a "n****r" and expressed her hope for his assassination; second, his telling Chief Sanders in July 2013 about the YouTube incident; third, his attorney's, James Davis, sending a letter to MVPD's "Director of HR" complaining that "Memorial Villages Police Department and its agents intentionally discriminated against him because of his race and age"; fourth, his other attorney's, Randall Kallien, sending a letter to the MVPD Commissioners complaining that DeFrancesco had been subjected to racial slurs "pointed out in a more extensive letter" from Davis; and fifth, his July 3, 2013 meeting with Chief Sanders where he specifically discussed Sergeant Sprinkle's use of racial slurs. Under the circumstances of this case, none of these activities is a protected activity.

An employee engages in protected activity by opposing a discriminatory practice, making or filing a charge, filing a complaint, or testifying, assisting, or participating in an investigation, proceeding, or hearing. TEX. LAB. CODE § 21.055. To establish opposition to a discriminatory practice, an employee "must demonstrate

24

a good-faith, reasonable belief that the underlying discriminatory practice violated the TCHRA." *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015). It is not enough that an employee finds the reported conduct offensive or unwelcoming. *Id.* at 138. The reasonableness of an employee's belief that his employer is engaging in a discriminatory practice is measured against substantive law that lays the parameters of unlawful discriminatory practices. *See, e.g.*, *Houston Methodist San Jacinto Hosp. v. Ford*, 483 S.W.3d 588, 592 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

***The YouTube incident***

Because two of DeFrancesco's alleged protected activities—his telling Sergeant Owens about a single instance where two officers showed Kelly an offensive YouTube video and his telling Chief Sanders the same—revolve around the same incident, we address them together. It is well established in Texas and federal jurisprudence that a single, isolated incident does not equate with a discriminatory employment practice.[3] No reasonable person could find that this

---

[3] *See Nicholas*, 461 S.W.3d at 138 ("Offhand comments and isolated incidents, unless extremely serious, typically will not amount to discriminatory changes in the 'terms, conditions, or privileges of employment.'") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)); *Ford*, 483 S.W.3d at 596–97 (holding that two isolated incidents of alleged sexual advances over four years' employment negated reasonable belief employer engaged in discriminatory practices); *Satterwhite v. City of Houston*, 602 F. App'x 585, 588 (5th Cir. 2015) (concluding that plaintiff did not have reasonable belief

25

YouTube incident, standing alone, satisfied statutory definition of discriminatory practices. DeFrancesco's mere mentioning of this isolated incident to Sergeant Owens and Chief Sanders could not have been accompanied by a reasonable belief that MVPD was engaging in discriminatory employment practices; it was therefore not a protected activity.

DeFrancesco points out, however, that MVPD, in its plea to the jurisdiction and summary-judgment motion, admitted that his discussion with Sergeant Owens about the video was a protected activity. We are not bound by a party's characterization of facts or legal conclusions. *See Stallworth v. Ayers*, 510 S.W.3d 187, 190 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Tex. S. Univ. v. Gilford*, 277 S.W.3d 65, 68 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). That

that single incident in which coworker made "Heil Hitler" comment was unlawful employment practice after referencing substantive law); *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 405–06 (5th Cir. 1999) (rejecting race-based termination claim because evidence of discrimination revealed only isolated incidents); *Weller v. Citation Oil & Gas Corp.,* 84 F.3d 191, 194–95 & n.5 (5th Cir.1996) (reversing jury award based on hostile-work-environment claim stemming from single incident in which supervisor provided employee with offensive religious materials); *see also Mendoza v. Helicopter,* 548 Fed. App'x. 127, 129 (5th Cir. 2013) (per curiam) (rejecting hostile-work-environment claim because "the complained of conduct occurred sporadically over a several year period and c[ould not] accurately be described as pervasive. Additionally, no single incident was severe enough to independently support a hostile work environment claim").

MVPD's attorneys may have viewed, in retrospect, DeFrancesco's discussion with Sergeant Owens as a protected activity has no legal significance here.

***The two attorney letters***

DeFrancesco's next alleged protected activity occurred when his attorney, James Davis, sent a letter to MVPD's "Director of HR" complaining that "Memorial Villages Police Department and its agents intentionally discriminated against him because of his race and age." Vague charges of discrimination that lack factual bases do not constitute protected activities invoking TCHRA protections. *See Azubuike v. Fiesta Mart, Inc.*, 970 S.W.2d 60, 65 (Tex. App.—Houston [14th Dist.] 1998, no pet.); *see also Spinks v. Trugreen Landcare, L.L.C.*, 322 F. Supp. 2d 784, 797 (S.D. Tex. 2004) (same for Title VII). Otherwise, every adverse employment action taken by an employer could be challenged under the TCHRA simply by an employee inserting a charge of discrimination. Davis's letter stated that the "factual basis for [DeFrancesco's] complaint is well known to management. . . . We have not provided facts to support this claim as a courtesy to you. They will be provided to you by the EEOC once we file the Charge of Discrimination. We do this as a courtesy for you, not to deprive you of the details." At no point in the letter did DeFrancesco cite an example of where MVPD negatively altered the terms, conditions, or privileges of his employment on the basis of his age or claimed Hispanic heritage. This vague charge of discrimination does not give rise to a protected activity.

27

The same is true for the second letter DeFrancesco sent to MVPD through his other attorney, Randall Kallinen, whose letter stated that DeFrancesco "had to endure racial and ethnic slurs by other MVPD officers which has created a hostile work environment." This letter also contains no specifics. It does not say which officers uttered these "racial and ethnic slurs," what those slurs were, when they were uttered, nor the context in which they were made. Instead of providing even a scintilla of a factual basis for his claim, DeFrancesco notes that the details were "pointed out in a more extensive previous letter . . . from the Law Office of James R. Davis." This is incorrect. As just discussed, the Davis letter lacked just as much detail and specificity as this one. Accordingly, Kallinen's letter fails to constitute a protected activity.

### *Alleged complaint to Chief Walpole*

DeFrancesco's next claimed protected activity occurred when, as he states in his brief, he "complained to Chief Walpole about racial harassment that resulted in a hostile work environment." DeFrancesco's characterization of his complaint to Chief Walpole as being about "racial harassment that resulted in a hostile work environment" is an exaggerated version of the facts.

The evidence is that after MVPD discovered the Denny's tape and heard DeFrancesco verbally abuse MVPD and its officers—calling Officer Sosa a "blonde bitch"; referring to his job as a "piece of cake"; explaining that all he does is sit

around with his radar up and play on his iPad; saying that if he "wasn't a cop," he would "beat the f**k out of [Sprinkle]," who was a "miserable f**k" and "the kind of guy you could just pound and pound and pound"—MVPD initiated a disciplinary proceeding against him. Following internal policies, MVPD allowed DeFrancesco to respond to the allegations.

In that response, DeFrancesco described the circumstances surrounding his arrival at Denny's. He noted the casual nature of the conversation and that he was simply discussing the circumstances of his retirement from the Houston Police Department with friends. He then explained that he made the disparaging statements because Sosa "treated [him] like a bitch" and because Sergeant Sprinkle "would call [me] to the station after I wrote a ticket to berate [me], he would call [me] after [I] did an accident report to berate [me] and that he actually made a racial slur to me in regard to my Hispanic heritage." Importantly, DeFrancesco did not attribute the "hostile work environment" to any racial or age discrimination. Rather, according to DeFrancesco, the "hostile work environment" was created by Officer Norwood, who once said that "all [he] has for DeFrancesco is a Remington slug" and who "constantly . . . tr[ied] to rat on [DeFrancesco] for anything."

This response was not a complaint of "racial harassment that resulted in a hostile work environment," as DeFrancesco attempts to characterize it. In the nearly 1,000-word response, DeFrancesco uses only sixteen of those words to discuss

29

Sergeant Sprinkle's alleged "racial slur." Further, the context in which DeFrancesco made this response makes clear that it was not a complaint but an effort to mitigate any punishment he might receive for disparaging MVPD and its officers. In fact, in the written reprimand that followed the disciplinary action, Chief Walpole specifically referenced DeFrancesco's response and noted, "Having taken into account the context of the seemingly casual conversation, your time at this agency, and your response to the complaint, I am issuing this written reprimand." No employer would have read DeFrancesco's response and been put on notice that a charge of racial discrimination was being made, nor would any person writing that response reasonably believe that he was opposing discriminatory practices. *See supra* note 3. DeFrancesco's response to the disciplinary action against him was not a protected activity.

### *Alleged complaint to Chief Sanders*

DeFrancesco's last claimed protected activity occurred when, as he describes it, he met with Chief Sanders on July 3, 2013, and "reiterated his complaints, specifically mentioning Sergeant Sprinkle's use of racial slurs." Although DeFrancesco did mention the slurs during the three-and-a-half hour conversation, he did so once and very briefly. The majority of that conversation consisted of DeFrancesco explaining why he believed other MVPD officers were treating him poorly, and he did not assert that it was because of his claimed Hispanic heritage.

30

The conversation began with DeFrancesco recounting Sosa calling him stupid and telling him that he does not know how to write police reports; Norwood saying that he hopes DeFrancesco dies; and Sergeant Sprinkle calling him into the station to berate him "[e]very time he made a traffic stop or did a report." DeFrancesco also described a time when he threw an egg at his own sister's car and how Sergeant Sprinkle met with Chief Walpole "and tr[ied] to get [him] for criminal mischief." [CRS#1 at 118]. When Chief Sanders asked DeFrancesco why he thought the other officers were treating him poorly, DeFrancesco responded, "Walpole was an old running buddy of mine back in the patrol days" and that, after Walpole hired him, "[a] group of [MVPD officers] thought he was going to bring me in and make me assistant chief or something."

Chief Sanders then asked DeFrancesco specifically why he felt Sergeant Sprinkle disliked him. DeFrancesco replied,

> I think he has an inferiority complex. I think the fact that I don't kiss his ass. I think he knows I have ten times the experience, education, and training than he does and the fact I just, and all of them. I think it's a threat to them. I mean, you know, like I didn't come here to be chief. . . . [B]ut I think it was set in stone before I even got here. Like he thought I was, they all, I think a lot of people thought, "Oh, this bigshot HP guy is going to come here and throw his weight around.

DeFrancesco also explained that when he first started, a group of officers, Sergeant Sprinkle included, would walk into homes where they suspected underage drinking without a "call for service." DeFrancesco refused to participate in the practice, and

31

when Sergeant Sprinkle asked him why he would not participate in the group, DeFrancesco responded, "The little group that's going to get civil rights violations? I'm not into that." DeFrancesco then added,

> [Sprinkle has] made like racial comments to me. Like one of the guys I arrested was from Guatemala. And he said to me, he goes, "Yeah", this is before he really hated me. He goes, "Yeah, it was like that Mexican you arrested the other night." So I said, "He wasn't Mexican, he's from Guatemala." And he goes, "Oh, I forgot. You're Hispanic, so you know, you're able to tell one from the other." And then, another time he, he's, he would use "beaner," the word "beaner" in front of me which I find offensive.

To be sure that DeFrancesco attributed the other officers' disdain for him to something other than his claimed Hispanic heritage, Chief Sanders followed up by asking, "[I]f you could put your finger on it . . . and say, 'This is why all this happening . . . [why] these folks [do] not like you," what would that be? DeFrancesco responded, "I think . . . there's an intimidation factor." He continued, "I mean, I know I have the credentials. . . . I probably have more experience and more education, experience and training than probably any five of these guys put together, and I don't feel I have to prove that. So meanwhile, [it is] because of that I'm just a target."

This conversation reflects that DeFrancesco did not believe the other officers were treating him poorly because of his claimed Hispanic heritage. Instead, as DeFrancesco explained, he believed they disliked him because his greater experience as a police officer made him a threat to their own career paths—a belief

32

that DeFrancesco reaffirmed during his deposition when he articulated the same beliefs. During his deposition, the following exchange occurred:

Q:    Did Sprinkle ever use any ethnic slurs in referring to you?

A:    No.

Q:    Has any—did any of the officers of the [MVPD] at any time you were employed there refer to you using some derogatory term for Hispanics?

A:    Not to me, no.

Q:    Are you aware of any officer of the [MVPD] using any racial or ethnic slur about you in conversations they reportedly had with other people?

A:    Not about me.

DeFrancesco never complained to any employee of MVPD that he was being treated poorly because of racial or age discrimination. Only once during his three-and-a-half-hour conversation with Chief Sanders did he mention that Sergeant Sprinkle used an ethnic slur. And he never cited his claimed Hispanic heritage as a reason for his poor treatment. Instead, throughout this conversation with Chief Sanders and his deposition, he repeatedly cited non-race, non-age-based rationales for his colleagues' conduct. Complaints of rude, offensive, or inconsiderate conduct are not protected activities. *See Nicholas*, 461 S.W.3d at 138.

Because we conclude that the evidence conclusively demonstrates that DeFrancesco did not engage in a protected activity, the trial court properly granted

MVPD's plea to the jurisdiction and motion for summary judgment. We therefore overrule DeFrancesco's first issue and do not reach his remaining issues.

## Conclusion

We affirm the judgment of the trial court.


Richard Hightower
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.